Fox v. FCC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: December 20, 2006                    Decided:  June 4, 2007)

Docket Nos. 06-1760-ag (L), 06-2750-ag (CON), 06-5358-ag (CON)

_____

FOX TELEVISION STATIONS, INC., CBS BROADCASTING, INC.,
WLS TELEVISION, INC., KTRK TELEVISION, INC., KMBC HEARST-
ARGYLE TELEVISION, INC., ABC, INC.,

        Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES
OF AMERICA,

        Respondents,

NBC UNIVERSAL, INC., NBC TELEMUNDO LICENSE CO., NBC
TELEVISION AFFILIATES, FBC TELEVISION AFFILIATES
ASSOCIATION, CBS TELEVISION NETWORK AFFILIATES, CENTER
FOR THE CREATIVE COMMUNITY, INC., doing business as CENTER
FOR CREATIVE VOICES IN MEDIA, INC., ABC TELEVISION AFFILIATES
ASSOCIATION,

        Intervenors.

_____

Before: LEVAL, POOLER, and HALL, Circuit Judges.

_____

Fox Television Stations, Inc. ("Fox") petitions for review of the November 6, 2006, order

of the Federal Communications Commission ("FCC") issuing notices of apparent liability against

two Fox broadcasts for violating the FCC's indecency regime. We find that the FCC's new policy sanctioning "fleeting expletives" is arbitrary and capricious under the Administrative Procedure Act for failing to articulate a reasoned basis for its change in policy. Accordingly, the petition for review is GRANTED, the order of the FCC is VACATED, and the matter is REMANDED to the agency for further proceedings consistent with this opinion.

Judge Leval dissents in a separate opinion.

CARTER G. PHILLIPS, Sidley Austin LLP, Washington D.C. (R. Clark Wadlow, James P. Young, Jennifer Tatel, David S. Petron, Sidley Austin LLP, Washington D.C. on the brief) *for Petitioner Fox Television Stations, Inc. and Intervenor FBC Television Affiliates Association*.

ERIC D. MILLER, Deputy General Counsel, for Samuel L. Feder, General Counsel, Federal Communications Commission, Washington D.C. (Matthew B. Berry, Daniel Armstrong, Jacob M. Lewis, Joseph R. Palmore, Federal Communications Commission and Jeffrey S. Bucholtz, Acting Assistant Attorney General, Thomas M. Bondy, Department of Justice, Washington D.C. on the brief) *for Respondents*.

Ellen S. Agress, Maureen A. O'Connell, Fox Television Stations, New York, NY *for Petitioner Fox Television Stations, Inc.*

Robert Corn-Revere, Ronald G. London, Amber L. Husbands, David M. Shapiro, Davis Wright Tremaine LLP, and Lee Levine, Levine Sullivan Koch & Schulz L.L.P., Washington D.C. *for Petitioner/Intervenor[1] CBS Broadcasting Inc.*

Miguel A. Estrada, Andrew S. Tulumello, Matthew D. McGill, Travis D. Lenkner, Gibson, Dunn, and Crutcher LLP, Washington D.C.; Richard Cotton, Susan Weiner, NBC Universal, Inc., New York, NY; and F. William LeBeau, NBC Universal, Inc. and NBC Telemundo License Co., Washington D.C. *for Intervenors NBC Universal, Inc. and NBC Telemundo License Co.*

Andrew J. Schwartzman, Parul P. Desai, Media Access Project, Washington D.C. *for Intervenor Center for Creative Voices in Media.*

Marjorie Heins, Brennan Center for Justice, Free Expression Policy Project, New

---

[1]CBS is a petitioner in Docket No. 06-1760 and an intervenor in Docket No. 06-5358.

York, NY *for Amici Curiae Brennan Center for Justice, American Civil Liberties Union, New York Civil Liberties Union, National Coalition Against Censorship, First Amendment Project, PEN American Center, American Booksellers Foundation for Free Expression, Writers Guild of America West, Directors Guild of America, Screen Actors Guild, American Federation of Television and Radio Artists, Writers Guild of America East, Minnesota Public Radio/American Public Media, National Federation of Community Broadcasters, Film Arts Foundation, Re:New Media, National Alliance for Media Arts and Culture, International Documentary Association, Working Films, and the Creative Coalition in support of Petitioners.*

John B. Morris, Jr., Sophia Cope, Center for Democracy & Technology and Adam D. Thierer, The Progress & Freedom Foundation, Washington D.C. *for Amici Curiae Center for Democracy & Technology and Adam Thierer, Senior Fellow with The Progress & Freedom Foundation ("PFF") and the Director of PFF's Center for Digital Media Freedom in support of Petitioners.*

Henry Geller, Washington D.C. and Glen O. Robinson, University of Virginia School of Law, Charlottesville, VA *for Amici Curiae Former FCC Officials in support of Petitioners*.

Robert R. Sparks, Jr., Sparks & Craig, LLP, McLean Virginia *for Amicus Curiae Parents Television Council in support of Respondents.*

Robert W. Peters, Robin S. Whitehead, Morality in Media, Inc., New York, NY *for Amicus Curiae Morality in Media, Inc. in support of Respondents.*

Thomas B. North, St. Ignace, MI *for Amicus Curiae Thomas B. North, Judge of Probate, Sixth Probate Court of Michigan*, *in support of Respondents.*

_____

POOLER, <u>Circuit Judge</u>:

Fox Television Stations, Inc., along with its affiliates FBC Television Affiliates Association (collectively "Fox"), petition for review of the November 6, 2006, order of the Federal Communications Commission ("FCC") issuing notices of apparent liability against two Fox broadcasts for violating the FCC's indecency and profanity prohibitions.[2] Fox, along with

---

[2] The petitions for review filed by Fox and CBS in Docket No. 06-1760 and ABC in Docket No. 06-2750 pertain to portions of a prior order by the FCC that has since been vacated.

other broadcast networks and numerous amici, raise administrative, statutory, and constitutional challenges to the FCC's indecency regime. The FCC, also supported by several amici, dispute each of these challenges. We find that the FCC's new policy regarding "fleeting expletives" represents a significant departure from positions previously taken by the agency and relied on by the broadcast industry. We further find that the FCC has failed to articulate a reasoned basis for this change in policy. Accordingly, we hold that the FCC's new policy regarding "fleeting expletives" is arbitrary and capricious under the Administrative Procedure Act. The petition for review is therefore granted, the order of the FCC is vacated, and the matter is remanded to the Commission for further proceedings consistent with this opinion. Because we vacate the FCC's order on this ground, we do not reach the other challenges to the FCC's indecency regime raised by petitioners, intervenors, and amici.

## BACKGROUND

The FCC's policing of "indecent" speech stems from 18 U.S.C. § 1464, which provides that "[w]hoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both." The FCC's authority to regulate the broadcast medium is expressly limited by Section 326 of the Communications Act, which prohibits the FCC from engaging in censorship. See 47 U.S.C. § 326. In 1960, Congress authorized the FCC to impose forfeiture penalties for violations of Section 1464. See 47 U.S.C. § 503(b)(1)(D). The FCC first exercised its statutory authority to sanction indecent (but non-obscene) speech in 1975, when it found Pacifica Foundation's radio

---

Accordingly, those petitions for review are denied as moot. The remainder of this opinion addresses the petition for review filed by Fox in Docket No. 06-5358.

broadcast of comedian George Carlin's "Filthy Words" monologue indecent and subject to forfeiture. See Citizen's Complaint Against Pacifica Found. Station WBAI(FM), N.Y, N.Y., 56 F.C.C.2d 94 (1975). True to its title, the "Filthy Words" monologue contained numerous expletives in the course of a 12-minute monologue broadcast on the radio at 2:00 in the afternoon. In ruling on this complaint, the FCC articulated the following description of "indecent" content:

> [T]he concept of 'indecent' is intimately connected with the exposure of children to language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience. Obnoxious, gutter language describing these matters has the effect of debasing and brutalizing human beings by reducing them to their mere bodily functions, and we believe that such words are indecent within the meaning of the statute and have no place on radio when children are in the audience.

Id. at ¶ 11 (internal footnote omitted).

Pacifica appealed the FCC's order to the Court of Appeals for the D.C. Circuit. While that appeal was pending, the FCC issued a "clarification" order in which it specifically noted that its prior order was intended to address only the particular facts of the Carlin monologue as broadcast, and acknowledged the concern that "in some cases, public events likely to produce offensive speech are covered live, and there is no opportunity for journalistic editing." 'Petition for Clarification or Reconsideration' of a Citizen's Complaint against Pacifica Foundation, Station WBAI(FM), N.Y., N.Y., 59 F.C.C. 2d 892, at ¶ 4 n.1 (1976) ("Pacifica Clarification Order"). The FCC stated that in such a situation, "we believe that it would be inequitable for us to hold a licensee responsible for indecent language." Id.

Although acknowledging the FCC's additional clarification, the D.C. Circuit nevertheless

5

concluded that the FCC's indecency regime was invalid.  See Pacifica Found. v. FCC, 556 F.2d 9 (D.C. Cir. 1977).  Labeling the Commission's actions censorship, the court found the FCC's order both vague and overbroad, noting that it would prohibit "the uncensored broadcast of many of the great works of literature including Shakespearian plays and contemporary plays which have won critical acclaim, the works of renowned classical and contemporary poets and writers, and passages from the *Bible*."  Id. at 14.

The Commission appealed this decision to the Supreme Court, which reversed in a plurality opinion.  In its brief to the Supreme Court, the FCC stressed that its ruling was a narrow one applying only to the specific facts of the Carlin monologue.  See Br. of FCC at 41-49, FCC v. Pacifica Found., No. 77-528 (U.S. Mar. 3, 1978), available at 1978 WL 206838.  The Court took the Commission at its word and confined its review to the specific question of whether the Commission could find indecent the Carlin monologue as broadcast.  See FCC v. Pacifica Found., 438 U.S. 726, 732-35 (1978).  The Court first rejected Pacifica's statutory argument that "indecent" in Section 1464 could not be read to cover speech that admittedly did not qualify as obscenity.  Id. at 739.  Finding that obscene, indecent, and profane have distinct meanings in the statute, the Court held that the FCC is permitted to sanction speech without showing that it satisfied the elements of obscenity.  Id. at 739-41.  The Court then rejected Pacifica's constitutional challenges.  The Court stated that "of all forms of communication, it is broadcasting that has received the most limited First Amendment protection" because the broadcast medium is a "uniquely pervasive presence in the lives of all Americans" that extends into the privacy of the home and is "uniquely accessible to children, even those too young to read."  Id. at 748-749.  The Court therefore found that the FCC could, consistent with the First

Amendment, regulate indecent material like the Carlin monologue. The Court then once again "emphasize[d] the narrowness of our holding . . . We simply hold that when the Commission finds that a pig has entered the parlor, the exercise of its regulatory power does not depend on proof that the pig is obscene." Id. at 750-51.

Justices Powell and Blackmun, who concurred in the judgment and supplied two of the votes necessary for the 5-4 majority,[3] also emphasized in their concurring opinion that the Court's holding was a narrow one limited to the facts of the Carlin monologue as broadcast. Id. at 755-56 (Powell J., concurring). Foreshadowing the question now before us, they explicitly noted that "[t]he Commission's holding, and certainly the Court's holding today, does not speak to cases involving the isolated use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here." Id. at 760-61 (Powell J., concurring). Furthermore, citing the FCC's brief to the Court, Justice Powell stated that he did not foresee an undue chilling effect on broadcasters by the FCC's decision because "the Commission may be expected to proceed cautiously, as it has in the past." Id. at 761 n.4 (Powell J., concurring).

The FCC took the Pacifica Court's admonitions seriously in its subsequent decisions.[4] Shortly after the Pacifica ruling, the FCC stated the following in an opinion rejecting a challenge to a broadcaster's license renewal on the basis that the broadcaster had aired indecent

---

[3]The four dissenting justices would have held invalid any attempt by the FCC to prohibit indecent (non-obscene) speech. See Pacifica, 438 U.S. at 762-80.

[4]At the time, the Commission interpreted Pacifica as involving a situation "about as likely to occur again as Halley's Comet." Br. of Amici Curiae Former FCC Officials at 6 (quoting FCC Chairman Charles D. Ferris, Speech to New England Broad. Assoc., Boston, Mass. (July 21, 1978)).

programming:

> With regard to 'indecent' or 'profane' utterances, the First Amendment and the 'no censorship' provision of Section 326 of the Communications Act severely limit any role by the Commission and the courts in enforcing the proscription contained in Section 1464. The Supreme Court's decision in *FCC v. Pacifica Foundation*, 46 U.S.L.W. 5018 (1978), No. 77-528, decided July 3, 1978, affords this Commission no general prerogative to intervene in any case where words similar or identical to those in Pacifica are broadcast over a licensed radio or television station. <u>We intend strictly to observe the narrowness of the Pacifica holding.</u> In this regard, the Commission's opinion, as approved by the Court, relied in part on the repetitive occurrence of the 'indecent' words in question. The opinion of the Court specifically stated that it was not ruling that 'an occasional expletive . . . would justify any sanction . . .' Further, Justice Powell's concurring opinion emphasized the fact that the language there in issue had been 'repeated over and over as a sort of verbal shock treatment.' He specifically distinguished 'the verbal shock treatment [in Pacifica]' from 'the isolated use of a potentially offensive word in the course of a radio broadcast.'

<u>Application of WGBH Educ. Found.</u>, 69 F.C.C.2d 1250, at ¶ 10 (1978) (emphasis added) (ellipses in original; internal footnotes and citations omitted). The FCC also specifically held that the single use of an expletive in a program that aired at 5:30pm "should not call for us to act under the holding of <u>Pacifica</u>." <u>Id.</u> at ¶ 10 n.6. A few years later, the Commission again rejected a challenge to a license renewal that complained the broadcaster had aired indecent programming in violation of Section 1464. The FCC acknowledged the complaint that the broadcaster on three separate occasions had aired programming during the morning hours containing language such as "motherfucker," "fuck," and "shit," but nevertheless concluded that "it is clear that the petitioner has failed to make a *prima facie* case that [the broadcaster] has violated 18 U.S.C. 1464" since the language did not amount to "verbal shock treatment" and the complainant had failed to show this was more than "isolated use." <u>Application of Pacifica Found.</u>, 95 F.C.C.2d 750, at ¶¶ 16, 18 (1983).

8

It was not until 1987 that the FCC would find another broadcast "indecent" under Section 1464.  See Infinity Broad. Corp., et al., 3 F.C.C.R. 930 (1987) ("Infinity Order").  The Commission explained:

> In cases decided subsequent to the Supreme Court's ruling [in Pacifica], the Commission took a very limited approach to enforcing the prohibition against indecent broadcasts. Unstated, but widely assumed, and implemented for the most part through staff rulings, was the belief that only material that closely resembled the George Carlin monologue would satisfy the indecency test articulated by the FCC in 1975.  Thus, no action was taken unless material involved the repeated use, for shock value, of words similar or identical to those satirized in the Carlin "Filthy Words" monologue . . . As a result, the Commission, since the time of its ruling in 1975, has taken no action against any broadcast licensee for violating the prohibition against indecent broadcasts.

Id. at ¶ 4 (internal footnotes omitted).  The Infinity Order affirmed on reconsideration three decisions issued simultaneously by the FCC in April 1987 that found certain programs indecent.  See Pacifica Found., Inc., 2 F.C.C.R. 2698 (1987); The Regents of the Univ. of Cal., 2 F.C.C.R. 2703 (1987); Infinity Broad. Corp., 2 F.C.C.R. 2705 (1987).  The FCC explained in the Infinity Order that it would no longer take the narrow view that a finding of indecency required the use of one of the seven "dirty words" used in Carlin's monologue.  See Infinity Order, at ¶ 5.  The FCC instead would use the generic definition of indecency it had articulated in connection with its prior decision in Pacifica.  Id.  Under the Commission's definition, "indecent speech is language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs.  Such indecent speech is actionable when broadcast at times of the day when there is a reasonable risk that children may be in the audience."  Regents of the Univ. of Cal., 2 F.C.C.R. 2703, at ¶ 3 (internal footnote omitted).  The FCC also reaffirmed, however, the prevailing view that a fleeting expletive would

not be actionable. See id. ("Speech that is indecent must involve more than an isolated use of an offensive word."); Pacifica Found., Inc., 2 F.C.C.R. 2698, at ¶ 13 ("If a complaint focuses solely on the use of expletives, we believe that under the legal standards set forth in Pacifica, deliberate and repetitive use in a patently offensive manner is a requisite to a finding of indecency."). Notably, in Pacifica Foundation, the Commission declined to make a finding of indecency against a radio broadcast of the program "Shocktime America," which had contained words and phrases such as "eat shit," "mother-fucker" and "fuck the U.S.A," in part because, without a transcript or tape of the program, the FCC was unable to determine "whether the use of patently offensive speech was isolated." Id. at ¶¶ 3, 17.

Broadcasters appealed the Infinity Order to the D.C. Circuit, challenging the FCC's definition of indecency as unconstitutionally vague. See Action for Children's Television v. FCC, 852 F.2d 1332 (D.C. Cir. 1988) ("ACT I"), superseded in part by Action for Children's Television v. FCC, 58 F.3d 654 (D.C. Cir. 1995) (in banc). The D.C. Circuit rejected this argument on the basis that the definition at issue was "virtually the same definition the Commission articulated in the order reviewed by the Supreme Court in the *Pacifica* case." Id. at 1338. The court concluded that Pacifica implicitly rejected any vagueness challenge to the FCC's definition of "indecent," which therefore foreclosed its ability to revisit any such argument. Id. at 1339. The court then invited correction from "Higher Authority" if its reading of Pacifica was incorrect. Id. Before leaving the First Amendment issue, however, the court explicitly noted that the "FCC has assured this court, at oral argument, that it will continue to give weight to reasonable licensee judgments when deciding whether to impose sanctions in a particular case. Thus, the potential chilling effect of the FCC's generic definition of indecency

10

will be tempered by the Commission's restrained enforcement policy." Id. at 1340 n.14 (citing Pacifica, 438 U.S. at 761 (Powell J., concurring)).

This restrained enforcement policy would continue. In 2001, pursuant to a settlement agreement by which the FCC agreed to clarify its indecency standards, the Commission issued a policy statement to "provide guidance to the broadcast industry regarding our case law interpreting 18 U.S.C. § 1464 and our enforcement policies with respect to broadcast indecency." Industry Guidance on the Commission's Case Law Interpreting 18 U.S.C. § 1464, 16 F.C.C.R. 7999, at ¶ 1 & ¶ 30 n.23 (2001) ("Industry Guidance"). The FCC first noted that "indecent speech is protected by the First Amendment, and thus, the government must both identify a compelling interest for any regulation it may impose on indecent speech and choose the least restrictive means to further that interest." Id. at ¶ 3.

The FCC then explained that an indecency finding involves the following two determinations: (1) whether the material falls within the "subject matter scope of [the] indecency definition – that is, the material must describe or depict sexual or excretory organs or activities"; and (2) whether the broadcast is "*patently offensive* as measured by contemporary community standards for the broadcast medium." Id. at ¶¶ 7-8. The FCC considers the following three factors in determining whether the material is patently offensive: "(1) the *explicitness or graphic nature* of the description or depiction of sexual or excretory organs or activities; (2) whether the materials *dwells on or repeats at length* descriptions of sexual or excretory organs or activities; (3) *whether the material appears to pander or is used to titillate*, or *whether the material appears to have been presented for its shock value*." Id. at ¶ 10. The policy statement contained numerous examples of prior FCC decisions evaluating whether certain material was indecent in

11

an attempt to provide guidance to broadcasters. In discussing the second factor in the "patently offensive" analysis, the FCC cited examples distinguishing between material that "dwells" on the offensive content (indecent) and material that was "fleeting and isolated" (not indecent). Id. at ¶¶ 17-18.

This restrained enforcement policy would soon change. During NBC's January 19, 2003, live broadcast of the Golden Globe Awards, musician Bono stated in his acceptance speech "this is really, really, fucking brilliant. Really, really, great." Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program, 19 F.C.C.R. 4975, at ¶ 3 n.4 (2004) ("Golden Globes"). Individuals associated with the Parents Television Council filed complaints that the material was obscene and indecent under FCC regulations. Id. at ¶ 3. The FCC's Enforcement Bureau, however, denied the complaints on the basis that the expletive as used in context did not describe sexual or excretory organs or activities and that the utterance was fleeting and isolated. See Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program, 18 F.C.C.R. 19859, at ¶¶ 5-6 (Enforcement Bureau 2003) ("Golden Globes (Bureau Decision)"). The Bureau accordingly found that the speech "does not fall within the scope of the Commission's indecency prohibition," and reaffirmed FCC policy that "fleeting and isolated remarks of this nature do not warrant Commission action." Id. at ¶ 6.

Five months later, the full Commission reversed the Bureau's decision. First, the FCC held that any use of any variant of "the F-Word" inherently has sexual connotation and therefore falls within the scope of the indecency definition. Golden Globes, at ¶ 8. The FCC then held that "the 'F-Word' is one of the most vulgar, graphic, and explicit descriptions of sexual activity

12

in the English language" and therefore the use of that word was patently offensive under contemporary community standards. Id. at ¶ 9. The Commission found the fleeting and isolated use of the word irrelevant and overruled all prior decisions in which fleeting use of an expletive was held not indecent. Id. at ¶ 12 ("While prior Commission and staff action have indicated that isolated or fleeting broadcasts of the 'F-Word' such as that here are not indecent or would not be acted upon, consistent with our decision today we conclude that any such interpretation is no longer good law.").

The FCC then held that the material in question was also "profane" under Section 1464. Id. at ¶ 13. The Commission acknowledged that prior decisions interpreting "profane" had defined that term as blasphemy, but found that nothing in its prior decisions limited the definition of profane in such a manner. Id. at ¶ 14. The Commission, however, declined to impose a forfeiture because "existing precedent would have permitted this broadcast" and therefore NBC and its affiliates "necessarily did not have the requisite notice to justify a penalty." Id. at ¶ 15. The Commission emphasized, though, that licensees were now on notice that any broadcast of the "F-Word" could subject them to monetary penalties and suggested that implementing delay technology would ensure future compliance with its policy. Id. at ¶ 17.

NBC, along with several other parties including Fox, filed petitions for reconsideration of the Golden Globes order, raising statutory and constitutional challenges to the new policy. NBC, Fox, and Viacom Inc. also filed a joint petition to stay the effect of the Golden Globes order. These petitions have been pending for more than two years without any action by the FCC. Nevertheless, the FCC has applied the policy announced in Golden Globes in subsequent cases.

On February 21, 2006, the FCC issued an order resolving various complaints against

13

several television broadcasts.  See Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C.R. 2664 (2006) ("Omnibus Order").  Through this order, the FCC intended to "provide substantial guidance to broadcasters and the public about the types of programming that are impermissible under our indecency standard."  Id. at ¶ 2.  In Section III.B of the Omnibus Order, the Commission found four programs—Fox's broadcast of the 2002 Billboard Music Awards, Fox's broadcast of the 2003 Billboard Music Awards, various episodes of ABC's NYPD Blue, and CBS's The Early Show—indecent and profane under the policy announced in Golden Globes.  The factual situations at issue are as follows:

- **2002 Billboard Music Awards**: In her acceptance speech, Cher stated: "People have been telling me I'm on the way out every year, right?  So fuck 'em."

- **2003 Billboard Music Awards**: Nicole Richie, a presenter on the show, stated: "Have you ever tried to get cow shit out of a Prada purse?  It's not so fucking simple."

- **NYPD Blue**: In various episodes, Detective Andy Sipowitz and other characters used certain expletives including "bullshit," "dick," and "dickhead."

- **The Early Show**: During a live interview of a contestant on CBS's reality show Survivor: Vanuatu, the interviewee referred to a fellow contestant as a "bullshitter."

Id. at ¶¶ 101, 112 n. 64, 125, 137.  In finding these programs indecent and profane, the FCC reaffirmed its decision in Golden Globes that any use of the word "fuck" is presumptively indecent and profane.  Id. at ¶¶ 102, 107.  The Commission then concluded that any use of the word "shit" was also presumptively indecent and profane.  Id. at ¶¶ 138, 143.  Turning to the second part of its indecency test, the FCC found that each of the programs were "patently

14

offensive" because the material was explicit, shocking, and gratuitous. Id. at ¶¶ 106, 120, 131, 141. Citing Golden Globes, the Commission dismissed the fact that the expletives were fleeting and isolated and held that repeated use is not necessary for a finding of indecency. Id. at ¶¶ 104, 116, 129, 140. The FCC, however, declined to issue a forfeiture in each case for the express reason that the broadcasts in question occurred before the decision in Golden Globes, and thus "existing precedent would have permitted this broadcast." Id. at ¶¶ 111, 124, 136, 145.

Fox and CBS filed a petition for review of the Omnibus Order in this court. ABC filed a petition for review in the D.C. Circuit, which was then transferred to this court and consolidated with the petition for review filed by Fox and CBS. Before any briefing took place, however, the FCC moved for a voluntary remand in order to give the Commission the first opportunity to address petitioners' arguments and "ensure that all licensees are afforded a full opportunity to be heard before the Commission issues a final decision." See FCC Mot. for Voluntary Remand at 2, No. 06-1760 (July 6, 2006). On September 7, 2006, this court granted the FCC's request for remand and stayed enforcement of the Omnibus Order. The Commission was given sixty days to issue a final or appealable order, at which time the pending appeal would be automatically reinstated.

The FCC promptly issued a public notice soliciting comments on its decision in the Omnibus Order. Numerous parties, including those who have participated in the briefing in this appeal, submitted comments raising various statutory and constitutional arguments against the FCC's indecency regime. The FCC then issued a new order on November 6, 2006. See Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, FCC 06-166 (Nov. 6, 2006) ("Remand Order"). The Remand Order vacated Section III.B

of the Omnibus Order in its entirety and replaced it with the Remand Order. Id. at ¶ 11. In the Remand Order, the FCC reaffirmed its finding that the 2002 and 2003 Billboard Music Award programs were indecent and profane, but reversed its finding against The Early Show. It also dismissed on procedural grounds the complaint against NYPD Blue.[5]

With regard to the 2003 Billboard Music Awards, the Commission found that it would have been actionably indecent even prior to the decision in Golden Globes because the potentially offensive material was "repeated," since Nicole Richie used "two extremely graphic and offensive words," and was "deliberately uttered" because of "Ms. Richie's confident and fluid delivery of the lines." Id. at ¶ 22. With regard to the 2002 Billboard Music Awards, the Commission "acknowledge[d] that it was not apparent that Fox could be penalized for Cher's comment at the time it was broadcast." Id. at ¶ 60. In both cases, the FCC rejected Fox's argument that fleeting expletives were not actionable, now characterizing its prior decisions on that issue as "staff letters and dicta." Id. at ¶ 20. The Commission, however, declined to impose a forfeiture for either broadcast. Id. at ¶¶ 53, 66.

Turning to The Early Show, the FCC reversed its finding that the expletive used was indecent or profane because it occurred in the context of a "*bona fide* news interview." Id. at ¶ 68. The Commission stated that in light of First Amendment concerns, "it is imperative that we

[5]The Commission dismissed the complaint against NYPD Blue because the only person who complained of the material resided in the Eastern time zone, where NYPD Blue aired during the "safe harbor" period after 10pm. Remand Order, at ¶ 75; see also 47 C.F.R. § 73.3999(b) (providing that broadcasting of indecent material is prohibited only between the hours of 6am and 10pm); Action for Children's Television v. FCC, 932 F.2d 1504 (D.C. Cir. 1991) ("ACT II") ("safe harbor" period is constitutionally required), superseded in part by Action for Children's Television v. FCC, 58 F.3d 654 (D.C. Cir. 1995) (in banc). In light of the FCC's revised decision regarding NYPD Blue, ABC is no longer participating in this appeal.

16

proceed with the utmost restraint when it comes to news programming," and found it "appropriate . . . to defer to CBS's plausible characterization of its own programming" as a news interview. Id. at ¶ 71-72. Given this context, the FCC declined to find the comment indecent or profane. Id. at ¶ 73.

In accordance with our September 6th order, this appeal was automatically reinstated on November 8, 2006. Fox then filed a petition for review of the Remand Order and moved to consolidate that appeal with the one already pending before this court. We granted the motion for consolidation as well as motions to intervene by CBS Broadcasting Inc. ("CBS") and NBC Universal Inc. and NBC Telemundo License Co. (collectively, "NBC"). We have also received several briefs from various amici.

## DISCUSSION

Fox, CBS, and NBC (collectively, "the Networks"), supported by several amici, raise a variety of arguments against the validity of the Remand Order, including: (1) the Remand Order is arbitrary and capricious because the Commission's regulation of "fleeting expletives" represents a dramatic change in agency policy without adequate explanation; (2) the FCC's "community standards" analysis is arbitrary and meaningless; (3) the FCC's indecency findings are invalid because the Commission made no finding of scienter; (4) the FCC's definition of "profane" is contrary to law; (5) the FCC's indecency regime is unconstitutionally vague; (6) the FCC's indecency test permits the Commission to make subjective determinations about the quality of speech in violation of the First Amendment; and (7) the FCC's indecency regime is an impermissible content-based regulation of speech that violates the First Amendment. The FCC, also supported by several amici, dispute each of these contentions. We agree with the first

17

argument advanced by the Networks, and therefore do not reach any other potential problems with the FCC's decision.

## I. Scope of Review

Before turning to the merits of the Networks' arguments, we first note that we reject the FCC's contention that our review here is narrowly confined to the specific question of whether the two Fox broadcasts of the Billboard Music Awards were indecent and/or profane. The Remand Order applies the policy announced in Golden Globes. If that policy is invalid, then we cannot sustain the indecency findings against Fox. Thus, as the Commission conceded during oral argument, the validity of the new "fleeting expletive" policy announced in Golden Globes and applied in the Remand Order is a question properly before us on this petition for review. As the D.C. Circuit explained in rejecting this precise argument in another proceeding, "the agency may not resort to adjudication as a means of insulating a generic standard from judicial review." ACT I, 852 F.2d at 1337.

## II. Administrative Procedure Act

Courts will set aside agency decisions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Supreme Court has explained: "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not

18

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. Reviewing courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." Id. (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)). The Networks contend that the Remand Order is arbitrary and capricious because the FCC has made a 180-degree turn regarding its treatment of "fleeting expletives" without providing a reasoned explanation justifying the about-face. We agree.

First, there is no question that the FCC has changed its policy. As outlined in detail above, prior to the Golden Globes decision the FCC had consistently taken the view that isolated, non-literal, fleeting expletives did not run afoul of its indecency regime. See, e.g., Pacifica Clarification Order, 59 F.C.C. 2d 892, at ¶ 4 n.1 (advising broadcasters that "it would be inequitable for us to hold a licensee responsible for indecent language" that occurred during a live broadcast without an opportunity for journalistic editing); Application of WGBH Educ. Found., 69 F.C.C.2d 1250, at ¶ 10 & n.6 (distinguishing between the "verbal shock treatment" of the George Carlin monologue and "the isolated use of a potentially offensive word" and finding that the single use of an expletive in a program "should not call for us to act under the holding of Pacifica"); Pacifica Foundation, Inc., 2 F.C.C.R. 2698, at ¶ 13 ("If a complaint focuses solely on the use of expletives, we believe that under the legal standards set forth in Pacifica, deliberate and repetitive use in a patently offensive manner is a requisite to a finding of indecency." (emphasis added)); Industry Guidance, 16 F.C.C.R. 7999, at ¶¶ 17-18 (distinguishing between material that is repeated or dwelled on and material that is "fleeting and isolated") (citing L.M.

19

Communications of S.C., Inc., 7 F.C.C.R. 1595 (Mass Media Bureau 1992) (finding the single

utterance of "mother-fucker" not indecent because it was a "fleeting and isolated utterance

which, within the context of live and spontaneous programming, does not warrant a Commission

sanction"); Lincoln Dellar, For Renewal of the Licenses of Stations KPRL(AM) and

KDDB(FM), 8 F.C.C.R. 2582 (Audio Serv. Div. 1993) (news announcer's remark that he

"fucked that one up" not indecent because the "use of a single expletive" did not warrant further

review "in light of the isolated and accidental nature of the broadcast")).  This consistent

enforcement policy changed with the issuance of Golden Globes:

> While prior Commission and staff action have indicated that isolated or fleeting
> broadcasts of the "F-Word" such as that here are not indecent or would not be
> acted upon, consistent with our decision today we conclude that any such
> interpretation is no longer good law . . . . The staff has since found that the
> isolated or fleeting use of the "F-Word" is not indecent in situations arguably
> similar to that here.  We now depart from this portion of the Commission's 1987
> *Pacifica* decision as well as all of the cases cited in notes 31 and 32 and any
> similar cases holding that isolated or fleeting use of the "F-Word" or a variant
> thereof in situations such as this is not indecent and conclude that such cases are
> not good law to that extent.

Golden Globes, 19 F.C.C.R. 4975, at ¶ 12 (internal footnote omitted); see also id. at ¶ 14

(providing new definition of "profane" speech).  The Commission declined to issue a forfeiture

in Golden Globes precisely because its decision represented a departure from its prior rulings.

See id. at ¶ 15 ("Given, however, that Commission and staff precedent prior to our decision today

permitted the broadcast at issue, and that we take a new approach to profanity, NBC and its

affiliates necessarily did not have the requisite notice to justify a penalty." (emphasis added)).

The Omnibus Order similarly declined to issue a forfeiture because "existing precedent would

have permitted this broadcast."  Omnibus Order, 21 F.C.C.R. 2664, at ¶¶ 111, 124, 136, 145.

Although the Remand Order backpedals somewhat on this clear recognition that the Commission was departing from prior precedent,[6] in its brief to this court, the FCC now concedes that <u>Golden Globes</u> changed the landscape with regard to the treatment of fleeting expletives. <u>See</u> Br. of Respondent FCC at 33 ("In the *Golden Globe Order*, the Commission made clear that it was changing course with respect to the treatment of isolated expletives."); <u>see also</u> Br. of Amici Curiae Former FCC Officials at 9 (noting that the "extraordinary and unprecedented" decision in <u>Golden Globes</u> represented a radical change in policy that "greatly expanded the scope of what constituted indecency").

Agencies are of course free to revise their rules and policies. <u>See</u> <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 863 (1984) ("An initial agency interpretation is not instantly carved in stone."). Such a change, however, must provide a reasoned analysis for departing from prior precedent. As this court has explained:

> [W]hen an agency reverses its course, a court must satisfy itself that the agency knows it is changing course, has given sound reasons for the change, and has shown that the rule is consistent with the law that gives the agency its authority to act. In addition, the agency must consider reasonably obvious alternatives and, if it rejects those alternatives, it must give reasons for the rejection, sufficient to allow for meaningful judicial review. Although there is not a "heightened standard of scrutiny . . . *the agency must explain why the original reasons for adopting the rule or policy are no longer dispositive*." Even in the absence of cumulative experience, changed circumstances or judicial criticism, an agency is

---

[6]In the Remand Order, the FCC "reject[s] Fox's suggestion that Nicole Richie's comments would not have been actionably indecent prior to our *Golden Globe* decision," and would only concede that it was "not apparent" that Cher's comment at the 2002 Billboard Music Awards would have been actionably indecent at the time it was broadcast. <u>Remand Order</u>, at ¶¶ 22, 60. Decisions expressly overruled in <u>Golden Globes</u> were now dismissed as "staff letters and dicta," and the Commission even implied that the issue of fleeting expletives was one of first impression for the FCC in <u>Golden Globes</u>. <u>Id.</u> at ¶ 21 ("[I]n 2004, the Commission itself considered for the first time in an enforcement action whether a single use of an expletive could be indecent.").

free to change course after reweighing the competing statutory policies. But such a flip-flop must be accompanied by a reasoned explanation of why the new rule effectuates the statute as well as or better than the old rule.

N.Y. Council, Ass'n of Civilian Technicians v. Fed. Labor Relations Auth., 757 F.2d 502, 508 (2d Cir. 1985) (second emphasis added; internal citations omitted); see also State Farm, 463 U.S. at 41-42 ("A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to." (internal quotation marks omitted)); Huntington Hosp. v. Thompson, 319 F.3d 74, 79 (2d Cir. 2002) ("While an agency is not locked into the first interpretation of a statute it embraces, it cannot simply adopt inconsistent positions without presenting 'some reasoned analysis.'"); Mr. Sprout, Inc. v. United States, 8 F.3d 118, 129 (2d Cir. 1993) ("When the Commission departs from its own settled precedent, as here, it must present a 'reasoned analysis' that justifies its change of interpretation so as to permit judicial review of its new policies."). An agency's "failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." Ramaprakash v. FAA., 346 F.3d 1121, 1125 (D.C. Cir. 2003) (internal quotation marks omitted). Accordingly, agency action will be set aside as arbitrary and capricious if the agency fails to provide a reasoned explanation for its decision. See, e.g., Massachusetts v. EPA, 127 S. Ct. 1438, 1463 (2007) ("EPA has offered no reasoned explanation for its refusal to decide whether greenhouse gases cause or contribute to climate change. Its action was therefore arbitrary, capricious, ... or otherwise not in accordance with law.") (ellipses in original; internal quotation marks omitted); State Farm, 463 U.S. at 34 (agency's rescinding of rule requiring passive restraints in automobiles was arbitrary and

22

capricious for failure to provide a reasoned explanation justifying revocation); see also Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 72 (2d Cir. 2006) (agency action based on new rule governing Medicare reimbursement was arbitrary and capricious "because the Secretary did not satisfactorily explain his reasons" for changing historical practice); ANR Pipeline Co. v. Fed. Energy Regulatory Comm'n, 71 F.3d 897, 901 (D.C. Cir. 1995) ("[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.").

Our evaluation of the agency's reasons for its change in policy is confined to the reasons articulated by the agency itself. See State Farm, 463 U.S. at 50 ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." (internal citation omitted)); Yale-New Haven Hosp., 470 F.3d at 81 ("Generally speaking, after-the-fact rationalization for agency action is disfavored."). The primary reason for the crackdown on fleeting expletives advanced by the FCC is the so-called "first blow" theory described in the Supreme Court's Pacifica decision. In Pacifica, the Supreme Court justified the FCC's regulation of the broadcast media in part on the basis that indecent material on the airwaves enters into the privacy of the home uninvited and without warning. 438 U.S. at 748. The Court rejected the argument that the audience could simply tune-out: "To say that one may avoid further offense by turning off the radio when he hears indecent language is like saying that the remedy for an assault is to run away after the first blow." Id. at 748-49. Relying on this statement in Pacifica, the Commission attempts to justify its stance on fleeting expletives on the basis that "granting an automatic exemption for 'isolated or fleeting' expletives unfairly forces

viewers (including children) to take 'the first blow.'" <u>Remand Order</u>, at ¶ 25.

We cannot accept this argument as a reasoned basis justifying the Commission's new rule. First, the Commission provides no reasonable explanation for why it has changed its perception that a fleeting expletive was not a harmful "first blow" for the nearly thirty years between <u>Pacifica</u> and <u>Golden Globes</u>. More problematic, however, is that the "first blow" theory bears no rational connection to the Commission's actual policy regarding fleeting expletives. As the FCC itself stressed during oral argument in this case, the Commission does not take the position that *any* occurrence of an expletive is indecent or profane under its rules.[7] For example, although "there is no outright news exemption from our indecency rules," <u>Remand Order</u>, at ¶ 71, the Commission will apparently excuse an expletive when it occurs during a "*bona fide* news interview," <u>id.</u> at ¶ 72-73 (deferring to CBS's "plausible characterization" of a segment of The Early Show interviewing a contestant on its reality show Survivor: Vanuatu as news programming and finding expletive uttered during that part of the show not indecent or profane). Certainly viewers (including children) watching the live broadcast of The Early Show were "force[d]...to take the 'first blow'" of the expletive uttered by the Survivor: Vanuatu contestant. Yet the Commission emphasized during oral argument that its news exception is a broad one and "the Commission has never found a broadcast to be indecent on the basis of an isolated expletive in the face of some claim that the use of that language was necessary for any journalistic or artistic purpose." The Commission further explained to this court that a broadcast of oral

---

[7]Such a per se ban would likely raise constitutional questions above and beyond the concerns raised by the current policy. See <u>Pacifica</u>, 438 U.S. at 746 (plurality opinion) ("Although these words ordinarily lack literary, political, or scientific value, they are not entirely outside the protection of the First Amendment. Some uses of even the most offensive words are unquestionably protected.").

24

argument in this case, in which the same language used in the Fox broadcasts was repeated multiple times in the courtroom, would "plainly not" be indecent or profane under its standards because of the context in which it occurred. The Commission even conceded that a re-broadcast of precisely the same offending clips from the two Billboard Music Award programs for the purpose of providing background information on this case would not result in any action by the FCC, even though in those circumstances viewers would be subjected to the same "first blow" that resulted from the original airing of this material. Furthermore, the Commission has also held that even repeated and deliberate use of numerous expletives is not indecent or profane under the FCC's policy if the expletives are "integral" to the work. See Complaints Against Various Television Licensees Regarding Their Broadcast on November 11, 2004, of the ABC Televison Network's Presentation of the Film "Saving Private Ryan", 20 F.C.C.R. 4507, at ¶ 14 (2005) ("Saving Private Ryan") (finding numerous expletives uttered during film Saving Private Ryan not indecent or profane because deleting the expletives "would have altered the nature of the artistic work and diminished the power, realism and immediacy of the film experience for viewers"). In all of these scenarios, viewers, including children who may have no understanding of whether expletives are "integral" to a program or whether the interview of a contestant on a reality show is a "*bona fide* news interview," will have to accept the alleged "first blow" caused by use of these expletives. Thus, the record simply does not support the position that the Commission's new policy was based on its concern with the public's mere exposure to this language on the airwaves.[8] The "first blow" theory, therefore, fails to provide the reasoned

_____

[8]Thus, our rejection of the agency's proffered rationale as the required "reasoned explanation" is not that the "Commission's change of standard is irrational because it is inconsistent" as the dissent suggests, dissent op. at **[47]**, but that the Commission's proffered

25

explanation necessary to justify the FCC's departure from established precedent.[9]

The Remand Order makes passing reference to other reasons that purportedly support its change in policy, none of which we find sufficient. For instance, the Commission states that even non-literal uses of expletives fall within its indecency definition because it is "difficult (if not impossible) to distinguish whether a word is being used as an expletive or as a literal description of sexual or excretory functions." Remand Order, at ¶ 23. This defies any common-sense understanding of these words, which, as the general public well knows, are often used in everyday conversation without any "sexual or excretory" meaning. Bono's exclamation that his victory at the Golden Globe Awards was "really, really fucking brilliant" is a prime example of a non-literal use of the "F-Word" that has no sexual connotation. See Golden Globes (Bureau Decision), 18 F.C.C.R. 19859, at ¶ 5 ("As a threshold matter, the material aired during the 'Golden Globe Awards' program does not describe or depict sexual and excretory activities and

---

rationale is disconnected from the actual policy implemented by the Commission. See State Farm, 463 U.S. at 43 (Agency action is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (emphasis added).

[9]The dissent takes the position that the "reasoned analysis" underlying the FCC's change in policy is its statement in Golden Globes that "given the core meaning of the 'F-Word,' any use of that word or a variation, in any context, inherently has a sexual connotation. . . . The 'F-Word' is one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language. Its use invariably invokes a coarse sexual image." Dissent Op. at **[43-44]** (quoting Golden Globes, at ¶¶ 8-9). Much like the "first-blow" theory, however, this cannot provide the requisite "reasoned analysis" because it is not consistent with the Commission's actual policy. The FCC's change in policy cannot be based on a categorical view that "any use of that word or a variation, in any context, inherently has a sexual connotation," Golden Globes, at ¶ 8 (emphasis added), because, as discussed above, the Commission permits even numerous and deliberate uses of that word in certain contexts. Notably, the FCC did not rely on this statement from Golden Globes in arguing that it provided a reasoned explanation for its decision. See Br. of Respondent FCC, at 36-37.

26

organs . . . . Rather, the performer used the word 'fucking' as an adjective or expletive to emphasize an exclamation."), rev'd by Golden Globes, 19 F.C.C.R. 4975 (2004). Similarly, as NBC illustrates in its brief, in recent times even the top leaders of our government have used variants of these expletives in a manner that no reasonable person would believe referenced "sexual or excretory organs or activities." See Br. of Intervenor NBC at 31-32 & n.3 (citing President Bush's remark to British Prime Minister Tony Blair that the United Nations needed to "get Syria to get Hezbollah to stop doing this shit" and Vice President Cheney's widely-reported "Fuck yourself" comment to Senator Patrick Leahy on the floor of the U.S. Senate).[10]

Similarly, the Commission's warning that a per se exemption for fleeting expletives would "permit broadcasters to air expletives at all hours of the day so long as they did so one at a time," Remand Order, at ¶ 25, is equally divorced from reality because the Commission itself recognizes that broadcasters have never barraged the airwaves with expletives even prior to Golden Globes, see Remand Order, at ¶ 29.[11] Finally, the Commission's claim that

---

[10]Contrary to the dissent's view, our rejection of this proffered rationale is not merely a "difference of opinion" with the agency. Dissent op. at **[52]**. We reject this reason not because we disagree with it, but because it is both unsupported by any record evidence as well as contradicted by evidence submitted by the Networks. Thus, we need not consider whether the FCC's statement that "any use of [the F-Word] or a variation, in any context, inherently has a sexual connotation," in actuality means, "even when the speaker does not intend a sexual meaning, a substantial part of the community, and of the television audience, will understand the word as freighted with an offensive sexual connotation," as the dissent suggests. Id. at **[51-52]** Even if we accept the dissent's reading, the FCC still has failed to set forth the required reasoned explanation because its proffered rationale remains unsupported by any record evidence and contradicted by the evidence submitted by the Networks. See Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 626 (1986) ("Agency deference has not come so far that we will uphold regulations whenever it is possible to 'conceive a basis' for administrative action.") (plurality op).

[11]We agree with the dissent that this proffered rationale "is at most a small part of the agency's justification for its action," dissent op. at **[50]**, but because it is one of the reasons advanced by the agency, we address it here. We disagree with the dissent, however, that our

"categorically requiring repeated use...is inconsistent with our general approach to indecency enforcement, which stresses the critical nature of context," Remand Order, at ¶ 23, also does not provide sufficient justification for its departure from prior precedent. First, the Commission's own policy of treating all variants of certain expletives as presumptively indecent and profane, whether used in a literal or non-literal sense, also fails to comport with this "general approach" that "stresses the critical nature of context." See, e.g., Golden Globes, 19 F.C.C.R. 4975, at ¶ 8 (declaring that "any use of [the F-Word] or a variation, in any context, inherently has a sexual connotation, and therefore falls within the first prong of our indecency definition") (emphasis added). In addition, the Commission's indecency test itself remains unchanged, but the Commission fails to provide a reasoned explanation for why a single, isolated expletive now should fit within the articulation of that test set forth in Golden Globes, see Pacifica Found., Inc., 2 F.C.C.R. 2698, at ¶ 13 ("If a complaint focuses solely on the use of expletives, we believe that under the legal standards set forth in Pacifica, deliberate and repetitive use in a patently offensive manner is a requisite to a finding of indecency.").

For decades broadcasters relied on the FCC's restrained approach to indecency regulation

rejection of this proffered rationale is a mere difference of opinion with the agency in predicting the future. The FCC's obligation to provide a "reasoned analysis" for its change in policy is not satisfied when the proffered rationale—that without its new policy the airwaves will be overtaken by fleeting expletives—is both unsupported by any evidence and directly contradicted by prior experience. We further note while the dissent attempts to provide support for the agency's prediction, including broadcasters' need to compete with cable "which increasingly make liberal use of their freedom to fill programming with such expletives," dissent op. at **[50]**, no evidence supporting this proposition is contained in the record that was considered by the FCC when rendering its decision. See, e.g., State Farm, 463 U.S. at 43 ("The reviewing court should not attempt itself to make up for [the agency's] deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'") (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

and its consistent rejection of arguments that isolated expletives were indecent. The agency asserts the same interest in protecting children as it asserted thirty years ago, but until the Golden Globes decision, it had never banned fleeting expletives. While the FCC is free to change its previously settled view on this issue, it must provide a reasoned basis for that change. Cf. State Farm, 463 U.S. at 42 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.") (emphasis added). The FCC's decision, however, is devoid of any evidence that suggests a fleeting expletive is harmful, let alone establishes that this harm is serious enough to warrant government regulation. Such evidence would seem to be particularly relevant today when children likely hear this language far more often from other sources than they did in the 1970s when the Commission first began sanctioning indecent speech. Yet the Remand Order provides no reasoned analysis of the purported "problem" it is seeking to address with its new indecency policy from which this court can conclude that such regulation of speech is reasonable. See, e.g., United States v. Playboy Enter. Group, Inc., 529 U.S. 803, 822-23 (2000) (rejecting indecency regulation of cable television in part because "[t]he question is whether an actual problem has been proved in this case. We agree that the Government has failed to establish a pervasive, nationwide problem justifying its nationwide daytime speech ban."); Turner Broad. Sys. v. FCC, 512 U.S. 622, 664 (1994) (remanding for additional fact finding to determine whether speech regulation justified because government had failed to demonstrate "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"); Quincy Cable TV, Inc. v. FCC, 768 F.2d 1434, 1463 (D.C. Cir. 1985) (invalidating FCC regulation because "the Commission has

failed entirely to determine whether the evil the rules seek to correct 'is a real or merely a fanciful threat'"); Home Box Office, Inc. v. FCC, 567 F.2d 9, 36 (D.C. Cir. 1977) ("[A] regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." (internal quotation marks omitted)).  The Commission has similarly failed to explain how its current policy would remedy the purported "problem" or to point to supporting evidence.

The Commission's new approach to profanity is supported by even less analysis, reasoned or not.  The Commission sets forth no independent reasons that would justify its newly-expanded definition of "profane" speech, aside from merely stating that its prior precedent does not prevent it from setting forth a new definition, see Golden Globes, 19 F.C.C.R. 4975, at ¶ 14.  To the extent the Commission believes its arguments for expanding its indecency enforcement support its new policy regarding profanity, those arguments are rejected for the reasons stated above.  Furthermore, the Commission fails to provide any explanation for why this separate ban on profanity is even necessary.  Prior to 2004, the Commission never attempted to regulate "profane" speech.  In fact, the Commission took the view that a separate ban on profane speech was unconstitutional.  See 122 Cong. Rec. 33359, 33359, 33364-65 (1976) (recommending Congress delete "profane" from Section 1464 "[b]ecause of the serious constitutional problems involved"); FCC, The Public and Broadcasting, 1999 WL 391297 (June 1999) ("Profanity that does not fall under one of the above two categories [indecent or obscene] is fully protected by the First Amendment and cannot be regulated.").  The Commission again has not provided this court with a reasoned analysis of why it has undertaken this separate regulation of speech.  Finally, the Commission provides no explanation of what harm this separate enforcement against profane

30

speech addresses that is not already addressed by the FCC's indecency and obscenity enforcement. Particularly considering that the scope of the FCC's new profanity definition appears to be largely (if not completely) redundant with its indecency prohibition, see infra Part IV.A, this would seem to be an important question for the Commission to consider. The Remand Order, however, provides no indication that the Commission has engaged in any such analysis.

Accordingly, we find that the FCC's new policy regarding "fleeting expletives" fails to provide a reasoned analysis justifying its departure from the agency's established practice. For this reason, Fox's petition for review is granted, the Remand Order is vacated, and the matter is remanded to the FCC for further proceedings consistent with this opinion. Because we have found that the FCC's new indecency regime, announced in Golden Globes and applied in the Remand Order, is invalid under the Administrative Procedure Act, the stay of enforcement previously granted by this court in our September 6th order is vacated as moot.[12]

## III.    Constitutional Challenges

"A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. N.W. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988). Thus, we refrain from deciding the various constitutional challenges to the Remand Order raised by the Networks. We note, however, that in reviewing these numerous constitutional challenges, which were fully briefed to

---

[12]We recognize that what follows is dicta, but we note that "dicta often serve extremely valuable purposes. They can help clarify a complicated subject. They can assist future courts to reach sensible, well-reasoned results. They can help lawyers and society to predict the future course of the court's rulings. They can guide future courts to adopt fair and efficient procedures. What is problematic is not the utterance of dicta, but the failure to distinguish between holding and dictum." The Honorable Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1253 (2006).

this court and discussed at length during oral argument, we are skeptical that the Commission can provide a reasoned explanation for its "fleeting expletive" regime that would pass constitutional muster. Because we doubt that the Networks will refrain from further litigation on these precise issues if, on remand, the Commission merely provides further explanation with no other changes to its policy, in the interest of judicial economy we make the following observations.

As an initial matter, we note that *all* speech covered by the FCC's indecency policy is fully protected by the First Amendment. See Sable Commc'ns v. FCC, 492 U.S. 115, 126 (1989) (noting that speech "which is indecent but not obscene is protected by the First Amendment"); Industry Guidance, 16 F.C.C.R. 7999, at ¶ 3 ("[I]ndecent speech is protected by the First Amendment, and thus, the government must both identify a compelling interest for any regulation it may impose on indecent speech and choose the least restrictive means to further that interest."). With that backdrop in mind, we question whether the FCC's indecency test can survive First Amendment scrutiny. For instance, we are sympathetic to the Networks' contention that the FCC's indecency test is undefined, indiscernible, inconsistent, and consequently, unconstitutionally vague. Although the Commission has declared that all variants of "fuck" and "shit" are presumptively indecent and profane, repeated use of those words in "Saving Private Ryan," for example, was neither indecent nor profane. And while multiple occurrences of expletives in "Saving Private Ryan" was not gratuitous, Saving Private Ryan, 20 F.C.C.R. 4507, at ¶ 14, a single occurrence of "fucking" in the Golden Globe Awards was "shocking and gratuitous," Golden Globes, 19 F.C.C.R. 4975, at ¶ 9. Parental ratings and advisories were important in finding "Saving Private Ryan" not patently offensive under contemporary community standards, Saving Private Ryan, 20 F.C.C.R. 4507, at ¶ 15, but irrelevant in

32

evaluating a rape scene in another fictional movie, see Omnibus Order, 21 F.C.C.R. 2664, at ¶ 38 (issuing maximum forfeiture penalty against NBC Telemundo for movie "Con el Corazón en la Mano"). The use of numerous expletives was "integral" to a fictional movie about war, Saving Private Ryan, 20 F.C.C.R. 4507, at ¶ 14, but occasional expletives spoken by real musicians were indecent and profane because the educational purpose of the documentary "could have been fulfilled and all viewpoints expressed without the repeated broadcast of expletives," Omnibus Order, 21 F.C.C.R. 2664, at ¶ 82 (finding Martin Scorsese's PBS documentary "The Blues: Godfathers and Sons" indecent). The "S-Word" on The Early Show was not indecent because it was in the context of a "*bona fide* news interview," but "there is no outright news exemption from our indecency rules," Remand Order, at ¶¶ 68, 71-73. We can understand why the Networks argue that FCC's "patently offensive as measured by contemporary community standards" indecency test coupled with its "artistic necessity" exception fails to provide the clarity required by the Constitution, creates an undue chilling effect on free speech, and requires broadcasters to "steer far wider of the unlawful zone," Speiser v. Randall, 357 U.S. 513, 526 (1958).

The Networks' position is further buttressed by the Supreme Court's decision in Reno v. ACLU, 521 U.S. 844 (1997), which struck down as unconstitutionally vague a similarly-worded indecency regulation of the Internet.[13] The Court found that the statute's use of the "general, undefined terms 'indecent' and 'patently offensive' cover large amounts of nonpornographic material with serious educational or other value. Moreover, the 'community standards' criterion

---

[13]Section 223(d) of the of the Communications Decency Act prohibited material that "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." Reno, 521 U.S. at 860.

as applied to the Internet means that any communication available to a nation wide audience will be judged by the standards of the community most likely to be offended by the message." Id. at 877-78. Because of the "vague contours" of the regulation, the Court held that "it unquestionably silences some speakers whose messages would be entitled to constitutional protection," and thus violated the First Amendment. Id. at 874. Because Reno holds that a regulation that covers speech that "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs" is unconstitutionally vague, we are skeptical that the FCC's identically-worded indecency test could nevertheless provide the requisite clarity to withstand constitutional scrutiny. Indeed, we are hard pressed to imagine a regime that is more vague than one that relies entirely on consideration of the otherwise unspecified "context" of a broadcast indecency.

We also note that the FCC's indecency test raises the separate constitutional question of whether it permits the FCC to sanction speech based on its subjective view of the merit of that speech. It appears that under the FCC's current indecency regime, any and all uses of an expletive is presumptively indecent and profane with the broadcaster then having to demonstrate to the satisfaction of the Commission, under an unidentified burden of proof, that the expletives were "integral" to the work. In the licensing context, the Supreme Court has cautioned against speech regulations that give too much discretion to government officials. See, e.g., Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992) ("A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view."); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758

34

(1988) (finding a permit scheme facially unconstitutional because "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression").  In succeeding on this challenge, the Networks need not prove that the FCC "has exercised [its] discretion in a content-based manner, but whether there is anything in [its policy] preventing [it] from doing so."  Forsythe, 505 U.S. at 133 n.10 ("It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.").

Finally, we recognize there is some tension in the law regarding the appropriate level of First Amendment scrutiny.  In general, restrictions on First Amendment liberties prompt courts to apply strict scrutiny.  FCC v. League of Women Voters, 468 U.S. 364, 376 (1984).  Outside the broadcasting context, the Supreme Court has consistently applied strict scrutiny to indecency regulations.  See, e.g., Playboy, 529 U.S. at 811-813 (holding that regulation proscribing indecent content on cable television was content-based restriction of speech subject to strict scrutiny); Sable, 492 U.S. at 126 (holding that indecency regulation of telephone messages was content-based restriction subject to strict scrutiny); Reno, 521 U.S. at 868 (holding that indecency regulation of Internet was a content-based restriction subject to strict scrutiny).  At the same time, however, the Supreme Court has also considered broadcast media exceptional.  "[B]ecause broadcast regulation involves unique considerations, our cases . . . have never gone so far as to demand that such regulations serve 'compelling' governmental interests."  League of Women Voters, 468 U.S. at 376.  Restrictions on broadcast "speech" have been upheld "when we [are] satisfied that the restriction is narrowly tailored to further a substantial governmental interest."

35

Id. at 380.

The Networks contend that the bases for treating broadcast media "different[ly]" have "eroded over time," particularly because 86 percent of American households now subscribe to cable or satellite services, Remand Order, at ¶ 49. As the Networks argue, this and other realities have "eviscerated" the notion that broadcast content is, as it was termed in Pacifica, 438 U.S. at 748-49, "uniquely pervasive" and "uniquely accessible to children." Whatever merit these arguments may have, they cannot sway us in light of Supreme Court precedent. See, e.g., Reno, 521 U.S. at 867 (noting that "as a matter of history" broadcast television has enjoyed less First Amendment protection than other media, including the internet); Pacifica, 438 U.S. at 748-50.

Nevertheless, we would be remiss not to observe that it is increasingly difficult to describe the broadcast media as uniquely pervasive and uniquely accessible to children, and at some point in the future, strict scrutiny may properly apply in the context of regulating broadcast television. In light of this possibility, the Networks rightly rest their constitutional argument in part on the holding of Playboy, which involved a challenge to a statute requiring cable operators who provide channels primarily dedicated to sexually explicit or otherwise indecent programming to either fully scramble these channels or limit their transmission to the 10pm to 6am safe harbor period. 529 U.S. at 806. The Supreme Court, applying strict scrutiny, invalidated the statute because a less restrictive alternative to the prohibition existed: "One plausible, less restrictive alternative could be found in another section of the [Telecommunications] Act [of 1996]: § 504, which requires a cable operator, 'upon request by a cable service subscriber . . . without charge, [to] fully scramble or otherwise fully block' any channel the subscriber does not wish to receive." Id. at 809-10. The Court held: This "targeted

36

blocking is less restrictive than banning, and the Government cannot ban speech if targeted

blocking is a feasible and effective means of furthering its compelling interests." Id. at 815. In

so holding, the Court suggested its decision might go beyond the mechanistic application of strict

scrutiny, and rely in part on a notional pillar of free speech—namely, choice:

> When a student first encounters our free speech jurisprudence, he or she might think it is influenced by the philosophy that one idea is as good as any other, and that in art and literature objective standards of style, taste, decorum, beauty, and esthetics are deemed by the Constitution to be inappropriate, indeed unattainable. Quite the opposite is true. The Constitution no more enforces a relativistic philosophy or moral nihilism than it does any other point of view. The Constitution exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed. What the Constitution says is that these judgments are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority. Technology expands the capacity to choose; and it denies the potential of this revolution if we assume the Government is best positioned to make these choices for us.

Id. at 818. The Court specifically rejected the arguments that parents' ignorance of this option,

its underutilization, or its inability to be 100% effective rendered targeted blocking an ineffective

alternative: "It is no response that voluntary blocking requires a consumer to take action, or may

be inconvenient, or may not go perfectly every time. A court should not assume a plausible, less

restrictive alternative would be ineffective; and a court should not presume parents, given full

information, will fail to act." Id. at 824.

The Networks argue that the advent of the V-chip and parental ratings system[14] similarly

---

[14]In 1996, Congress mandated that every television, 13 inches or larger, sold in the United States, come equipped with blocking technology commonly known as the V-chip. See 47 U.S.C. § 303(x) (stating that in the case of an "apparatus" designed to receive television signals, "such apparatus [shall] be equipped with a feature designed to enable viewers to block display of all programs with a common rating"). To implement V-chip technology, Congress also required a television ratings system. The industry developed the "TV Parental Guidelines" rating system, which was approved by the FCC. See In the Matter of Implementation of Section 551 of the Telecommunications Act of 1996, 13 F.C.C.R. 8232, at ¶ 2.

provide a less restrictive alternative to the FCC's indecency ban. The FCC counters that the V-chip is an ineffective alternative because, in its view, few televisions feature a V-chip, most parents do not know how to use it, programs are often inaccurately rated, and fleeting expletives, such as those witnessed at the programs at issue here, could elude V-chip blocking even if the show during which they occurred was otherwise accurately labeled. See Remand Order, at ¶ 51 & n. 162. The FCC's arguments are not without merit, but they must be evaluated in the context of today's realities. The proliferation of satellite and cable television channels—not to mention internet-based video outlets—has begun to erode the "uniqueness" of broadcast media, while at the same time, blocking technologies such as the V-chip have empowered viewers to make their own choices about what they do, and do not, want to see on television. Playboy distinguished Pacifica on the grounds that "[c]able systems have the capacity to block unwanted channels on a household-by-household basis" and thus "[t]he option to block reduces the likelihood, so concerning to the Court in Pacifica, that traditional First Amendment scrutiny would deprive the Government of all authority to address this sort of problem." 529 U.S. at 815 (internal citation omitted). The FCC is free to regulate indecency, but its regulatory powers are bounded by the Constitution. If the Playboy decision is any guide, technological advances may obviate the constitutional legitimacy of the FCC's robust oversight.

## IV. The FCC's Construction of Profane

The Networks also argue that the FCC employed an improper definition of "profane" under Section 1464. Although we need not reach this argument to dispose of this appeal, on remand, the FCC may desire to explain its gloss on the definition of "profane." In the Remand Order, the FCC applied its new definition of "profane" as set forth in Golden Globes. The FCC

now defines "profane" as "those personally reviling epithets naturally tending to provoke violent resentment or denoting language which under contemporary community standards is so grossly offensive to members of the public who actually hear it as to amount to a nuisance." Golden Globes, 19 F.C.C.R. 4975, at ¶ 13 (quoting *Tallman v. United States*, 465 F.2d 282, 286 (7th Cir. 1972)). The FCC, noting that "shit" and "fuck" fall within this definition, ruled that Cher's and Nicole Richie's fleeting expletives were "profane," as well as indecent. Most dictionaries interpret the term "profane" to denote something that pertains to the irreligious, and since 1927, courts—as well as the FCC itself—have assumed that "profane" in the broadcast context refers to sacrilege, and nothing more. See, e.g. Duncan v. United States, 48 F.2d 128, 134 (9th Cir. 1931) (collecting cases and holding defendant "was properly convicted of using profane language" where he "referred to an individual as 'damned,' . . . used the expression 'By God' irreverently, and . . . announced his intention to call down the curse of God"); Gagliardo v. United States, 366 F.2d 720, 725 (9th Cir. 1966) ("the only words attributed to appellants which could even remotely be considered as being 'profane' . . . were 'God damn it'"); In re Complaint by Warren B. Appleton, Brockton, Mass., 28 F.C.C.2d 36 (1971) (analyzing the word "damn" as a matter of profanity). As the FCC notes, the Seventh Circuit's 1972 Tallman decision, 465 F.2d at 286, suggested an alternate definition for this term, but we do not believe the FCC can find refuge in this case. Tallman concerned a prosecution for obscenity, not profanity, and thus the Tallman court had no occasion to determine conclusively how profane should be interpreted. See id. ("The trial judge did not undertake to define the terms 'indecent' and 'profane,' but he had no occasion to do so because he determined that petitioner's utterances were properly classifiable as 'obscene.'"). The Tallman court's brief reference to "profane" served only to demonstrate that

39

there may be a construction of "profane" that could pass constitutional scrutiny.

But the FCC's definition of "profane" here, would substantially overlap with the statutory term "indecent." This overlap would be so extensive as to render the statutory term "indecent" superfluous. Because our canons of statutory construction do not permit such an interpretation, see TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001), we do not believe the FCC has proffered a reasonable construction of the term "profane." While we may owe Chevron deference to the FCC's construction, the FCC must still demonstrate that its construction is reasonable, particularly in light of Congressional intent, the canons of statutory construction, and the historical view of the plain meaning of this term.

## CONCLUSION

As the foregoing indicates, we are doubtful that by merely proffering a reasoned analysis for its new approach to indecency and profanity, the Commission can adequately respond to the constitutional and statutory challenges raised by the Networks. Nevertheless, because we can decide this case on this narrow ground, we vacate and remand so that the Commission can set forth that analysis. While we fully expect the Networks to raise the same arguments they have raised to this court if the Commission does nothing more on remand than provide additional explanation for its departure from prior precedent, we can go no further in this opinion. Accordingly, we grant the petition for review, vacate the order of the FCC, and remand the case for further proceedings consistent with this opinion. The stay previously granted by this court is vacated as moot.

Leval, *J., dissenting*:

I respectfully dissent from my colleagues' ruling because I believe the Federal Communications Commission ("FCC" or "Commission") gave a reasoned explanation for its change of standard and thus complied with the requirement of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A).

A television broadcaster, Fox Television Stations, Inc., challenges the lawfulness of a small change made by the FCC in its standards for adjudicating complaints of indecency over the airwaves. The Commission exercises the responsibility of determining, upon receipt of public complaints, whether a licensed broadcaster has violated 18 U.S.C. § 1464 by disseminating indecent material over the airwaves. Beginning with its adjudication of complaints arising from the broadcast of the Golden Globe Awards in 2002, the Commission instituted a change in its manner of dealing with "fleeting," i.e. unrepeated, expletives. During this broadcast, rock-musician Bono expressed delight over his receipt of an award by saying, "[T]his is really, really, fucking brilliant." In a lengthy tradition of previous FCC rulings, absence of repetition of an expletive had been virtually conclusive against finding an indecency violation. The staff therefore recommended in Bono's case, largely because the expletive was unrepeated, that no violation be found. *See Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 18 F.C.C.R. 19859, at ¶ 6 (Enforcement Bureau 2003). The Commission reversed the recommendation of its staff. Adopting a new altered standard, which diminished the significance of the fact that the potentially offensive expletive was not repeated, the Commission concluded that the broadcast of Bono's expletive constituted

41

indecency in violation of § 1464. *See Complaints Against Various Broadcast Licensees Regarding Their Airing of the "Golden Globe Awards" Program*, 19 F.C.C.R. 4975, at ¶¶ 12, 17 (2004) ("*Golden Globes*").

The occurrences under review in this case followed soon after the Bono incident, during live broadcasts by Fox of Billboard Music Awards shows in 2002 and 2003. In the 2002 Billboard Music Awards, the actress and singer Cher, expressing triumphant delight upon her receipt of an award, said, "People have been telling me I'm on the way out every year, right? So fuck 'em." The incident during the 2003 Billboard Music Awards involved Nicole Richie and Paris Hilton, the co-stars of a serialized televised comedy show entitled, "The Simple Life," as presenters of awards. In "The Simple Life," Richie and Hilton play themselves as two spoiled, rich young women from Beverly Hills who cope with life on a farm. In joking reference to their own show, Richie said, "Why do they even call it 'The Simple Life?' Have you ever tried to get cow shit out of a Prada purse? It's not so fucking simple." The Commission received complaints about each incident. Referring to its newly changed policy developed in response to the Bono incident in *Golden Globes*, the Commission found that the two Billboard Music incidents were violations. *See Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005*, 21 F.C.C.R. 13299 (2006) ("*Remand Order*"). Fox brought this action seeking to invalidate the Commission's rulings.

In adjudicating indecency complaints the Commission generally employs a context-based evaluation to determine whether the particular utterance is "*patently offensive* as measured by contemporary community standards." *Industry Guidance on the Commission's Case Law*

42

*Interpreting 18 U.S.C. § 1464*, 16 F.C.C.R. 7999, at ¶ 8 (2001) ("*Industry Guidance*") (emphasis in original).   Factors weighing in favor of a finding of indecency are: "(1) the *explicitness or graphic nature* of the description or depiction of sexual or excretory organs or activities; (2) whether the material *dwells on or repeats at length* descriptions of sexual or excretory organs or activities; (3) *whether the material appears to pander or is used to titillate,* or *whether the material appears to have been presented for its shock value*." *Industry Guidance*, at ¶ 10 (emphasis in original).  Especially in relation to the "pandering" factor, a finding of violation is less likely if the broadcast of the utterance involved a genuine news report, or if censorship of the expletive would harm or distort artistic integrity.  Prior to the Bono incident, the Commission attached great importance to the second factor, which focuses on whether an expletive was repeated.  Under the pre-*Golden Globes* rulings, the fact that an utterance was fleeting was virtually conclusive in assuring it would not be deemed a violation (unless it breached special barriers, such as by referring to sexual activities with children).  With its *Golden Globes* adjudication, however, the Commission adopted a less permissive stance.  It announced that henceforth fleeting expletives would be judged according to a standard more closely aligned with repeated utterances of expletives.  Thus, the Commission has declared that it remains unlikely to find a violation in an expletive that is broadcast in the context of a genuine news report, or where censorship by bleeping out the expletive would compromise artistic integrity, but it will no longer give a nearly automatic pass merely because the expletive was not repeated. *See Remand Order*, at ¶ 23.

The Commission explained succinctly why lack of repetition of the F-Word would no

43

longer result in a virtual free pass. "[W]e believe that, given the core-meaning of the 'F-Word,' any use of that word or a variation, in any context, inherently has a sexual connotation . . . . The 'F-Word' is one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language. Its use invariably invokes a coarse sexual image." *Golden Globes,* at ¶¶ 8-9. "[A]ny use of that word has a sexual connotation even if the word is not used literally." *Remand Order*, at ¶ 16.

My colleagues find that in so altering its standards the Commission has acted illegally. They rule that the Commission failed to give a reasoned analysis explaining the change of rule. They accordingly find that the change of standard was arbitrary and capricious and therefore violated the Administrative Procedure Act. I disagree. In explanation of this relatively modest change of standard, the Commission gave a sensible, although not necessarily compelling, reason. In relation to the word "fuck," the Commission's central explanation for the change was essentially its perception that the "F-Word" is not only of extreme and graphic vulgarity, but also conveys an inescapably sexual connotation. The Commission thus concluded that the use of the F-Word – even in a single fleeting instance without repetition – is likely to constitute an offense to the decency standards of § 1464.

The standards for judicial review of administrative actions are discussed in a few leading Supreme Court opinions from which the majority quotes. Agencies operate with broad discretionary power to establish rules and standards, and courts are required to give deference to agency decisions. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). A court must not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) ("Administrative decisions should [not] be set aside . . . because the court is unhappy with the result reached."). In general, an agency's determination will be upheld by a court unless found to be "arbitrary and capricious." *See* 5 U.S.C. 706(2)(A).

An agency is free furthermore to change its standards. *See Chevron*, 467 U.S. at 863 ("An initial agency interpretation is not instantly carved in stone."); *Huntington Hosp. v. Thompson*, 319 F.3d 74, 79 (2d Cir. 2002) ("[A]n agency is not locked into the first interpretation of a statute it embraces."); *Ramaprakash*, 346 F.3d at 1125 ("Agencies are free to change course as their expertise and experience may suggest or require."). The Supreme Court has made clear that when an agency changes its standard or rule, it is "obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42. If an agency without explanation were to make an adjudication which is not consistent with the agency's previously established standards, the troubling question would arise whether the agency has lawfully changed its standard, or whether it has arbitrarily failed to adhere to its standard, which it may not lawfully do.[15] Accordingly our court has ruled that "an agency . . . cannot simply adopt inconsistent positions without presenting

---

[15] Judge Friendly noted:

> What gives concern is the manner, alas not atypical of the agencies, in which [a] change was made – slipped into an opinion in such a way that only careful readers would know what had happened, without articulation of reasons, and with prior authorities not overruled, so that the opinion writers remain free to pull them out of the drawer whenever the agency wishes to reach a result supportable by the old rule but not the new.

Henry J. Friendly, The Federal Administrative Agencies 63 (1962).

'some reasoned analysis.'" *Huntington Hosp.,* 319 F.3d at 79. Such explanation, we have said, is necessary so that the reviewing court may "be able to understand the basis of the agency's action so that it may judge the consistency of that action with the agency's mandate." *Mr. Sprout, Inc. v. United States*, 8 F.3d 118, 129 (2d Cir. 1993). The District of Columbia Circuit has similarly reasoned that an agency's "failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Ramaprakash*, 346 F.3d at 1125 (quotation marks omitted). In changing course, an agency must "provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Id*. at 1124 (quotation marks omitted).

In my view, in changing its position on the repetition of an expletive, the Commission complied with these requirements. It made clear acknowledgment that its *Golden Globes* and *Remand Order* rulings were not consistent with its prior standard regarding lack of repetition. It announced the adoption of a new standard. And it furnished a reasoned explanation for the change. Although one can reasonably disagree with the Commission's new position, its explanation – at least with respect to the F-Word – is not irrational, arbitrary, or capricious. The Commission thus satisfied the standards of the Administrative Procedures Act.

The Commission explained that the F-Word is "one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language [whose] use invariably invokes a coarse sexual image." *Golden Globes*, at ¶ 9. In other words, the Commission found, contrary to its earlier policy, that the word is of such graphic explicitness in inevitable reference to sexual activity that absence of repetition does not save it from violating the standard of decency.

46

My colleagues offer several arguments in support of their conclusion that the Commission's explanation was not reasonable and therefore arbitrary and capricious. They argue (i) the Commission's position is irrational because of inconsistency resulting from the Commission's willingness to allow viewers to be subjected to a "first blow" if it comes in the context of a genuine news broadcast; (ii) the Commission's prediction that allowance of fleeting expletives will result in a great increase in their incidence is irrational because prior experience was to the contrary; and (iii) the Commission is "divorced from reality" believing that the F-Word invariably invokes a sexual connotation. I respectfully disagree.

The majority argues that the Commission's change of standard is irrational because it is inconsistent. The opinion goes on to explain:

> [T]he Commission does not take the position that *any* occurrence of an expletive is indecent . . . . [T]he Commission will apparently excuse an expletive when it occurs during a "*bona fide* news interview". . . . The Commission even conceded that a re-broadcast of precisely the same offending clips of the two Billboard Music Award programs for the purpose of providing background information on this case would not result in any action by the FCC . . . . [E]ven repeated and deliberate use of numerous expletives is not indecent . . . if the expletives are "integral" to the work [as in the case of the film "Saving Private Ryan"].

Majority op. at pages 24-25. The majority is of course correct that the Commission does not follow an all-or-nothing policy. Its standards do attempt to draw context-based distinctions, with the result that no violation will be found in circumstances where usage is considered sufficiently justified that it does not constitute indecency.

This, however, is in no way a consequence of the Commission's change of standard for fleeting expletives. It applies across the board to all circumstances. Regardless of whether the expletive was repeated or fleeting, the Commission will apply context-based standards to

47

determine whether the incident constituted indecency. A bona fide news context and recognition of artistic integrity favor a finding of no violation. The majority's criticism of inconsistency is not properly directed against the change of standard here in question, which has done nothing to increase the inconsistency. If anything, the change of standard has made the Commission more consistent rather than less, because under the new rule, the same context-based factors will apply to all circumstances. If there is merit in the majority's argument that the Commission's actions are arbitrary and capricious because of irrationality in its standards for determining when expletives are permitted and when forbidden, that argument must be directed against the entire censorship structure. It does not demonstrate that the Commission's change of standard for the fleeting expletive was irrational.

Furthermore, while the Commission will indeed allow the broadcast of the same material in some circumstances but not in others, I do not see why this differentiation should be considered irrational. It rather seeks to reconcile conflicting values. On the one hand, it recognizes, as stressed by the Supreme Court in *Pacifica*, the potential for harm to children resulting from exposure to indecency. On the other hand, the Commission has historically recognized that categorical prohibition of the broadcast of all instances of usage of a word generally considered indecent would suppress material of value, which should not be deemed indecent upon consideration of the context. This is not irrationality.[16] It is an attempt on the part

_____

[16] Spectators in the courtroom observing the argument of this case would have heard the judges and the lawyers saying "fuck" in open court. Had the case been on another subject, such usage would surely have seemed inappropriate. Because of the issues in this case, the word was central to the issues being discussed. It is not irrational to take context into account to determine whether use of the word is indecent.

of the Commission over the years to reconcile conflicting values through standards which take account of context.

The majority then argues that the Commission reasoned irrationally when in its *Remand Order*, as a part of its explanation for its change of position, the Commission observed:

> [G]ranting an automatic exemption for "isolated or fleeting" expletives . . . would as a matter of logic permit broadcasters to air expletives at all hours of a day so long as they did so one at a time. For example, broadcasters would be able to air . . . offensive . . . words, regardless of context, with impunity . . . provided that they did not air more than one expletive in any program segment.

*Remand Order*, at ¶ 25. The majority asserts that this concern was "divorced from reality." Majority op. at page 27. On the majority's view, because broadcasters did not "barrage[] the airwaves with expletives" during the period prior to *Golden Globes* when fleeting expletives received a free pass, they would not do so in the future.

The agency has one prediction of what would likely occur in the future under the pre-*Golden Globes* policy. The majority has another. The majority may be right in speculating that the Commission's concern is exaggerated. Who knows? As a matter of law, it makes no difference. The court is obligated to give deference to agency judgment and may not substitute its judgment for that of the agency, or set aside an agency action merely because the court believes the agency is wrong. *See State Farm*, 463 U.S. at 43 (court must not "substitute its judgment for that of the agency"); *Vermont Yankee*, 45 U.S. at 558 ("Administrative decisions should [not] be set aside . . . because the court is unhappy with the result."). Only if the agency's action is "arbitrary and capricious" may the court nullify it. 5 U.S.C. § 706(2)(A).

Furthermore, if obligated to choose, I would bet my money on the agency's prediction.

The majority's view presupposes that the future would repeat the past. It argues that because the networks were not flooded with discrete, fleeting expletives when fleeting expletives had a free pass, they would not be flooded in the future. This fails to take account of two facts. First, the words proscribed by the Commission's decency standards are much more common in daily discourse today than they were thirty years ago. Second, the regulated networks compete for audience with the unregulated cable channels, which increasingly make liberal use of their freedom to fill programming with such expletives. The media press regularly reports how difficult it is for networks to compete with cable for that reason.[17] It seems to me the agency has good reason to expect that a marked increase would occur if the old policy were continued.

In any event, even if the majority could reasonably label *this aspect* of the Commission's reasoning "arbitrary and capricious," it still would not matter. The agency's action in changing the standard for fleeting expletives did not depend on the defensibility of this prediction. It is at most a small part of the agency's justification for its action.

Finally the majority disagrees with the Commission's view that the word "fuck"

---

[17] *See, e.g.*, Gail Pennington, *Kingpin There Are More Things in Heaven and Earth Than "Sopranos," NBC Insists*, St. Louis Post-Dispatch, Feb. 2, 2003, at F1 ("Although they tried at first to feign indifference, broadcasters have seethed for years over the critical acclaim and abundant awards handed to cable series like "The Sopranos." The complaint: that the playing field isn't level. Broadcasters are strained by FCC rules about content – nudity and sex, violence and language – that don't apply to cable."); Jim Rutenberg, *Few Viewers Object as Unbleeped Bleep Words Spread on Network TV*, N.Y. Times, Jan. 25, 2003, at B7 ("Broadcast television, under intensifying attack by saltier cable competitors, is pushing the limits of decorum further by the year, and hardly anyone is pushing back."); Jim Rutenberg, *Hurt by Cable, Networks Spout Expletives*, N.Y. Times, Sept. 2, 2001, at 11 ("Broadcast television is under siege by smaller cable competitors that are winning audiences while pushing adult content. In that climate, broadcast is fighting the perception that its tastes are lagging behind those of a media-saturated culture whose mores have grown more permissive.").

communicates an "inherently . . . sexual connotation [and] invariably invokes a coarse sexual image." *Golden Globes*, at ¶¶ 8-9. The majority notes that the F-Word is often used in everyday conversation without any sexual meaning. Majority op. at page 26. I agree with the majority that the word is often used without a necessary *intention on the part of the speaker* to refer to sex. A student who gets a disappointing grade on a test, a cook who burns the roast, or a driver who returns to his parked car to find a parking ticket on the windshield, might holler out the F-Word to express anger or disappointment. The word is also sometimes used to express delight, as with Bono's exhilarated utterance on his receipt of his award. Some use it more as a declaration of uncompromising toughness, or of alignment on the side of vulgarity against prissy manners, without necessarily intending to evoke any sexual meaning. Some use it to intensify whatever it is they may be saying, and some sprinkle the word indiscriminately throughout their conversation with no apparent meaning whatsoever.

The majority, however, misunderstands the Commission's reasoning, or in any event interprets it in the manner least favorable to the Commission. In observing that *fuck* "invariably invokes a coarse sexual image," *Golden Globes*, at ¶ 9, that this is so "even if the word is not used literally," *Remand Order*, at ¶ 16, and that its power to offend "derives from its sexual . . . meaning," *id*. at ¶ 23, the Commission did not mean that every speaker who utters the word invariably intends to communicate an offensive sexual meaning. The Commission explicitly recognized that the word can be used in a manner that does not intend a sexual meaning. A fairer reading of the Commission's meaning is that, even when the speaker does not intend a sexual meaning, a substantial part of the community, and of the television audience, will understand the

51

word as freighted with an offensive sexual connotation. It is surely not irrational for the Commission to conclude that, according to the understanding of a substantial segment of the community, the F-Word is never completely free of an offensive, sexual connotation. It is no accident that in many languages, the equivalent of the F-Word finds usage, as in English, to express anger, disgust, insult, and confrontation.

What we have is at most a difference of opinion between a court and an agency. Because of the deference courts must give to the reasoning of a duly authorized administrative agency in matters within the agency's competence, a court's disagreement with the Commission on this question is of no consequence. The Commission's position is not irrational; it is not arbitrary and capricious.

I believe that in changing its standard, the Commission furnished a reasoned explanation, and thus satisfied the requirements of the Administrative Procedures Act.[18]  I therefore respectfully dissent.[19]

---

[18] As each of the instances under review in this case involved the use of the F-Word, and because I find that the Commission has given a rational justification for its rule as applied to use of the F-Word, I do not consider the Commission's standard which makes it a decency violation to use the word "shit."  In *Pacifica*, in upholding the constitutionality of censorship under § 1464, the Supreme Court stressed the accessibility of broadcasting to children.  *See Pacifica*, 438 U.S. at 749; *Remand Order*, at ¶ 51.  The potential for harm to children resulting from indecent broadcasting was clearly a major concern justifying the censorship scheme.  In this regard, it seems to me there is an enormous difference between censorship of references to sex and censorship of references to excrement.  For children, excrement is a main preoccupation of their early years. There is surely no thought that children are harmed by hearing references to excrement.

Nicole Richie's script called for her to say it was not easy to get "pig crap" out of a Prada purse.  In delivering the line, Richie changed "pig crap" to "cow shit." Had she stuck with "pig crap," that reference would not have been a violation, but her change to "cow shit" could have resulted in forfeitures and perhaps even the loss of Fox's license to broadcast.   In another instance, the Commission found a violation (which was later vacated on other grounds) because someone was described as a "bullshitter." *See Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005*, 21 F.C.C.R. 2664 (2006); *Remand Order*, at ¶ 73.  The justification is surely not that children will be harmed by hearing "shit" but not by hearing "crap." It appears that at least some of the Commission's prohibitions are not justified at all by the risk of harm to children but only by concern for good manners. When the censorship is exercised only to protect polite manners and not by reason of risk of harm, I question whether it can survive scrutiny.  Because each instance of censorship at stake in this case involved the F-Word, which in the Commission's view inherently retains a sexual reference, the question does not arise in this case.

[19] I express neither agreement nor disagreement with my colleagues' added discussion of Fox's other challenges to the Commission's actions because, as the majority opinion recognizes, it is dictum and therefore not an authoritative precedent in our Circuit's law.  In subsequent adjudications, the respect accorded to dictum depends on its persuasive force and not on the fact that it appears in a court opinion.